**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

**CHRISTOPHER R. CONVERSINO,**                    Case No. 5:19 CV 2726

      Plaintiff,                              Judge Sara Lioi

      v.                                     Magistrate Judge James R. Knepp II

**COMMISSIONER OF SOCIAL SECURITY,**

      Defendant.                             **REPORT AND RECOMMENDATION**

### INTRODUCTION

Plaintiff Christopher R. Conversino ("Plaintiff") filed a Complaint against the Commissioner of Social Security ("Commissioner") seeking judicial review of the Commissioner's decision to deny disability insurance benefits ("DIB"). (Doc. 1). The district court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). This matter has been referred to the undersigned for preparation of a report and recommendation pursuant to Local Rule 72.2. (Non-document entry dated November 20, 2019). Following review, and for the reasons stated below, the undersigned recommends the decision of the Commissioner be affirmed.

### PROCEDURAL BACKGROUND

Plaintiff filed for DIB in August 2016, alleging a disability onset date of July 1, 2014. (Tr. 309-15). His claims were denied initially and upon reconsideration. (Tr. 225-32, 234-40). Plaintiff (represented by counsel), and a vocational expert ("VE") testified at a hearing before an administrative law judge ("ALJ") on October 9. 2018. (Tr. 126-89). On December 10, 2018, the ALJ found Plaintiff not disabled in a written decision. (Tr. 11-23). The Appeals Council denied Plaintiff's request for review, making the hearing decision the final decision of the Commissioner.

(Tr. 1-6); *see* 20 C.F.R. §§ 404.955, 404.981. Plaintiff timely filed the instant action on November 20, 2019. (Doc. 1).

## FACTUAL BACKGROUND

Personal Background and Testimony

Born in 1969, Plaintiff was 45 years old on his alleged onset date. *See* Tr. 309. He had a college education, and spent two years in the military before being medically discharged. (Tr. 132-33). Plaintiff previously worked as a sales representative, manager at a video store, collections agent, customer service manager, and retail clerk; he also worked part-time work with the Boy Scouts. *See* Tr. 134-45, 147-48. At the time of the hearing, Plaintiff lived with his wife and two teenage sons. (Tr. 130-31).

Plaintiff was involved in car accidents in October 2014 (Tr. 145-46), January 2015 (Tr. 153), and March 2018 (Tr. 162-63). He originally had thoracic spine injuries and pain resulting therefrom. (Tr. 153). Plaintiff tried medication, physical therapy, massage, injections, and stretching. (Tr. 157, 176-77). He described various medication side effects such as insomnia, drowsiness, and cognitive difficulty. (Tr. 162). Physicians thought Plaintiff's disc injuries were partly degenerative and partly from the car accidents; they did not recommend surgery. (Tr. 160-61).

At times physical therapy helped, but it was "pretty easy for [him] to digress [sic] again or backslide." (Tr. 158). Plaintiff said picking up a gallon of milk or "twist[ing] wrong" would set his pain off again. *Id.* Plaintiff used a cane for the prior year or two to help with balance and lessen the pressure on his knee and back. (Tr. 159). It was not prescribed by a doctor. *Id.*

After his March 2018 car accident, Plaintiff testified his condition worsened. (Tr. 162-63). He described an increase in pain, specifically neck pain leading to right arm numbness, and an

"[i]nability to perform tasks". (Tr. 163). The arm numbness happened "from time to time", and resulted from "doing too much", such as stooping to load the dishwasher; it could also occur after sleeping in a certain position. *Id.* Plaintiff returned to physical therapy, and traction helped with his cervical spine pain and right arm numbness. (Tr. 164).

Plaintiff also had carpal tunnel syndrome for which he wore a brace; he did not want surgery. (Tr. 165). It caused pain with writing, typing, and using a remote control. *Id.*

Plaintiff had difficulty lifting, walking, sitting, and bending. (Tr. 169-70). He did some woodworking for about twenty minutes at a time, but only on a good day (Tr. 172).

Plaintiff used a computer, but "only for short periods". (Tr. 172). He used the "hunt and peck" method for typing and had to look down at the keyboard. (Tr. 172-73). Sitting and looking down strained his back. *Id.* When using a phone, tablet, or reading a book, he "use[d] a pillow to prop it up" so as not to extend and strain his neck. (Tr. 174). Plaintiff testified he could not look down at something for more than twenty to thirty minutes; doing so pinched a nerve and caused his arm to go numb. (Tr. 175). If he looked down for that period of time, he would then need a break for "a couple hours". *Id.* When asked whether this was "something that has been going on for a while or . . . just since [his] last car accident", Plaintiff responded: "It's been going on for a while. That's part of what my - - it's connected to that arm numbness. It's what pinches that nerve and will send my arm numb, so yeah, I - - the last accident, certainly, that's when I started the therapy and they started doing the [traction]." *Id.*

Plaintiff also spent one or two days per week laying down "just waiting for the medication to kick in". (Tr. 176).

3

Relevant Medical Evidence

After his October 2014 car accident, an urgent care physician diagnosed Plaintiff with a thoracic spine strain, prescribed medication, and instructed Plaintiff to follow up with his primary care physician if his symptoms did not resolve. (Tr. 405-06).

Later that month, Plaintiff saw primary care physician Vincent Perkowski, D.O., reporting continued pain. (Tr. 607-09). On examination, Dr. Perkowski observed marked paraspinal and midline tenderness at T8-10, as well as limited range of motion. (Tr. 608). He assessed back pain, thoracic somatic dysfunction, and thoracic and lumbar strains. (Tr. 609). Dr. Perkowski prescribed Tizadine and Hydrocodone-acetaminophen and ordered a CAT scan. *Id.*

In January 2015, Plaintiff was involved in a second car accident. *See* Tr. 400. An MRI, performed due to back pain and arm numbness, showed a mild disc protrusion at multiple upper thoracic levels and an inferiorly extruded disc fragment in the midline at T6-7. (Tr. 552, 697). Mark Weiner, M.D., recommended against surgery, noting it would require a thoracotomy. (Tr. 401). On examination, Dr. Weiner found Plaintiff had normal strength and reflexes. (Tr. 401). Dr. Weiner wrote Plaintiff had "a very small disk herniation, tiny disk herniation, at T6-7" and "recommend[ed] that he continue treating this with conservative measures." (Tr. 399). Dr. Weiner noted Plaintiff was in physical therapy and recommended epidural injections if therapy was unsuccessful. (Tr. 401).

At his physical therapy visit in February 2015, Plaintiff reported thoracic pain and arm numbness "when he moves certain ways". (Tr. 698). On examination, he had mild tenderness to palpation in his thoracic spine, and reduced trunk range of motion "due to pain and guarding." (Tr. 699). He was discharged after nine visits, at which time he stated he intended to pursue pain management. (Tr. 715); *see also* Tr. 698-711, 715-23, 727-35.

4

At a May 2015 pain management visit with Gamaliel Batalla, M.D., Plaintiff reported two thoracic epidural steroid injections helped somewhat, but a TENS unit did not. (Tr. 743). He took Robaxin, gabapentin and meloxicam; he further said hydrocodone helped his pain. *Id.* On examination he had thoracic paraspinal muscle spasm and tenderness, as well as increased pain on range of motion. *Id.* Dr. Batalla adjusted Plaintiff's medications to address a side effect of insomnia and recommended he continue injections and try massage therapy. *Id.* He "again reiterated . . . that [he] d[id] not have any basis to give [Plaintiff] opioids." *Id.*

In March 2016, Plaintiff sought pain management treatment with David Gutlove, M.D., at Mercy Pain Medicine. (Tr. 761). Plaintiff was taking Neurontin, Flexeril, tramadol, and Diclofenac. *Id.* Plaintiff described "mainly thoracic pain" which was a "dull ache that increases to sharp with movement." *Id.* On examination, Plaintiff had pain with thoracic flexion and extension, tenderness to palpation along the thoracic paraspinous musculature, and full strength in his upper and lower extremities. (Tr. 763). Dr. Gutlove adjusted Plaintiff's medications and recommended Plaintiff continue physical therapy. (Tr. 763-64).

In April 2016, Plaintiff sought treatment with Georges Markarian, M.D., for worsening middle back pain aggravated by daily activities, sitting, standing, and walking. (Tr. 548). He said physical therapy and pain management did not provide relief. *Id.* On examination, Plaintiff had moderate pain with motion, and tenderness in his thoracic spine. (Tr. 550). Dr. Markarian recommended Plaintiff "continue[] with conservative treatment." *Id.*

A June 2016 MRI showed right paracentral disc protrusion at C6-7; some disc protrusion at C7-T1; facet arthritis and mild foraminal narrowing at T1; some facet degeneration at C4-5; a "tiny midline disk protrusion" at T5-6; a small inferiorly extruded disc fragment at T6-7; and mild

facet arthritis at T9-10 and T10-11. (Tr. 567-68). The conclusion was "[m]ultilevel disk and facet disease . . . similar to the 1/6/2015 study." *Id.*

At a podiatry examination for heel pain in July 2016, the physician noted Plaintiff felt "well otherwise" and had "no new complaints." *Id.* Plaintiff had normal strength and range of motion in his upper and lower extremities. (Tr. 630).

From June to August 2016, Plaintiff underwent additional thoracic trigger point injections with Dr. Gutlove. *See* Tr. 822-55. In August, he reported 30 percent improvement with his prior three injections. (Tr. 825).

In October 2016, Plaintiff returned to Mercy Pain Medicine and saw Beth Canfield[1]. (Tr. 773-77). He had minimal complaints of pain with lumbar range of motion, negative straight leg raises, and full strength in his upper and lower extremities. (Tr. 775). Ms. Canfield diagnosed chronic pain syndrome, and continued Plaintiff's medications. (Tr. 790). She noted tramadol "allows [Plaintiff] to perform [activities of daily living], interact with family and friends which improves his quality of life". (Tr. 776).

In January 2017, Plaintiff returned to Ms. Canfield with minimal complaints of pain with lumbar range of motion and full strength in his upper and lower extremities. (Tr. 789). She diagnosed chronic pain syndrome, and continued Plaintiff's medications. (Tr. 790). She repeated her statement that tramadol "allows [Plaintiff] to perform [activities of daily living], interact with family and friends which improves his quality of life". *Id.*

Plaintiff returned to Dr. Perkowski in June for right knee pain. (Tr. 814-19). On musculoskeletal examination, he had normal muscle strength and tone. (Tr. 817). His diagnosis of chronic low back pain was unchanged; he still took baclofen and tramadol. (Tr. 817-18).

---

1. The records do not indicate what medical qualifications Ms. Canfield possessed.

In March 2018, Plaintiff was involved in a rear-end car accident; he went to the emergency room for back pain, neck pain, and headache. *See* Tr. 858-67. A cervical spine CT scan showed:

> No acute osseous abnormality. There are degenerative changes. Multilevel disc protrusions/disc osteophyte complex is noted abutting the thecal sac. Detail is limited due to patient's large body habitus. There is significant spondylosis with paracentral disc protrusion at C6-7 as well as at C7-T1 on the comparison MRI of the thoracic spine of 2016.

(Tr. 875-76); *see also* Tr. 993 (Ms. Canfield's review of CT scan).

Plaintiff returned to physical therapy in April 2018 for neck and knee pain. (Tr. 976). In May 2018, Plaintiff returned to Ms. Canfield. (Tr. 993-97). He reported forward flexion with reading and cooking caused increased pain; neck pain radiated to his right arm/hand with some numbness; lower back pain increased with activity; and stabbing, intermittent upper back pain. (Tr. 993). On examination, Plaintiff had minimal complaints of pain with lumbar range of motion, negative straight leg raises, full strength in his upper and lower extremities, tenderness with cervical range of motion, and negative cervical facet tenderness bilaterally. (Tr. 996). Ms. Canfield continued Plaintiff on medications including tramadol, gabapentin, baclofen, Effexor, and melatonin, stating that "[t]hese medications help[] [Plaintiff] perform [activities of daily living], interact with family and friends." *Id.* She instructed Plaintiff to continue physical therapy, and call when he was ready to schedule trigger point injections; Plaintiff was holding off on trigger point injections because physical therapy was helping. *Id.*

Plaintiff had over twenty physical therapy visits between April and June 2018. *See* Tr. 976-79; 1001-65. In therapy, Plaintiff underwent, *inter alia*, neck ultrasound, and cervical traction for reduction of altered sensation in his right arm. (Tr. 977). In June 2018, at his eighteenth visit, the provider noted Plaintiff had met his goal to reduce his cervical/thoracic pain to a level of five out of ten with improved ability to "perform more household tasks with less rests." (Tr. 978) ("goal

7

met for cervical pain as he feels he has returned to [prior level of function]"); *see also* Tr. 1015 ("I feel I am back to where I was for my neck, I have pain but the numbness into the [right upper extremity] is infrequent."). As to Plaintiff's goal to improve his cervical range of motion with a reduction in right upper extremity numbness, the provider noted: "goal met with noted improved rotational movement with patient reporting a reduction in the frequency of numbness to the [right upper extremity]." *Id.* Plaintiff reported mild sleep disturbance due to back or neck pain, with slight improvement. *Id.* The provider summarized that Plaintiff "reported improvement[,] however remains vague in his noted improvements" and that "[p]ain remain[ed] his limiting factor at the neck". (Tr. 978). Subsequent visits were focused primarily on Plaintiff's knee, rather than neck, pain. *See* Tr. 1001-14.

In June 2018, Plaintiff was diagnosed with mild to moderate right carpal tunnel syndrome after a nerve conduction study. (Tr. 984-85, 1069-73).

In August 2018, Plaintiff saw Dr. Gutlove. (Tr. 1074-76). Dr. Gutlove said Plaintiff's medications "have improved his overall quality of life and functionality by allowing him to do household chores, interact with family, going to restaurants, and [h]is quality-of-life is clearly improved on these medications." (Tr. 1074). On examination, he was using a cane, but had full strength in his upper and lower extremities. *Id.* He further had decreased range of motion in his cervical spine in flexion, extension, rotation, and lateral tilt, as well as trigger point tenderness in the paracervical and shoulder stabilizer muscle groups. *Id.* Dr. Gutlove continued Plaintiff's medications, noting he "continue[d] to do very well" on them and that they "improve[d] his overall functionality and activity levels." (Tr. 1075). Plaintiff expressed interest in trigger point injections, however his mother was to be enrolled in hospice so "the timing [was] not good for him to get

injections". *Id.* Dr. Gutlove further noted Plaintiff was scheduled to have carpal tunnel surgery, and advised Plaintiff to "[c]ontinue to be as active as possible." *Id.*

*Opinion Evidence*

In February 2015, physical therapist Sue Budiscak, P.T., performed a functional capacity evaluation of Plaintiff. *See* Tr. 670-77. She opined Plaintiff would "safely be able to perform activities in the sedentary physical demand category for infrequent lifting knuckle to shoulder, shoulder to overhead[,] and the carry test." (Tr. 676). She believed he could "sit for unlimited periods of time performing fine motor dexterity skills". *Id.*

In December 2016, state agency physician Leon Hughes, M.D., reviewed Plaintiff's records and offered a residual functional capacity opinion. (Tr. 199-201). He opined Plaintiff could occasionally lift twenty pounds, and frequently lift ten; stand and/or walk, or sit, for about six hours each in an eight-hour workday. (Tr. 199). He found Plaintiff limited to frequent climbing of ramps and stairs, kneeling, and crouching, as well as to occasional balancing, stooping, crawling, and climbing ladders, ropes, or scaffolds. (Tr. 200). He further opined Plaintiff should avoid even moderate exposure to vibration and hazards. (Tr. 200-01).

In May 2017, state agency physician Abraham Mikalov, M.D., reviewed Plaintiff's records, and concurred with Dr. Hughes's opinions. (Tr. 214-16).

VE Testimony

A VE testified at the hearing before the ALJ. (Tr. 177-88). The ALJ asked the VE to consider a hypothetical individual with Plaintiff's age, education, work experience, and residual functional capacity ("RFC") as ultimately determined by the ALJ. *See* Tr. 181-83. The VE responded that such an individual could perform some of Plaintiff's past work, as well as other jobs such as food and beverage order clerk, document preparer, and charge account clerk. (Tr. 183-

84). The VE further testified that being off-task more than ten percent of the time, or being absent more than once a month on average would be work-preclusive. (Tr. 185-86). The VE further testified that a person with restricted neck movement – "flexed in a downward position . . . at 45 degrees [e.g., looking at paperwork on a desk, or looking at a computer keyboard]. . . for 20 to 30 minutes at a time, but wouldn't be able to return to that flexed position for a few hours thereafter" – would not be able to perform Plaintiff's past work or the other identified jobs. (Tr. 186-87).

ALJ Decision

In her December 2018 written decision, the ALJ determined Plaintiff met the insured status requirements of the Social Security Act through June 30, 2020, and had not engaged in substantial gainful activity since July 1, 2014, the alleged onset date. (Tr. 13). She found he had severe impairments of degenerative disc disease of the cervical and thoracic spines, with C6-7 and C7-T1 disc bulges and stenosis; mild degenerative joint disease of the bilateral knees, with patellofemoral syndrome; chronic pain syndrome; and morbid obesity. *Id.* The ALJ concluded that none of these impairments – individually or in combination – met or medically equaled a listed impairment. (Tr. 14). Thereafter, the ALJ set forth Plaintiff's RFC:

> The claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.2567(a), and as follows: The claimant can never climb ladders, ropes, or scaffolds and he should avoid exposure to vibration, moving machinery, and unprotected heights. He can frequently perform handling and fingering tasks with his dominant right upper extremity, he can perform frequent overhead reaching bilaterally, and he can frequently climb ramps/stairs. The claimant can occasionally balance, stoop, kneel, crawl, and crawl [sic].

*Id.* Considering the Plaintiff's age, education, work experience and RFC, the ALJ found Plaintiff could perform his past work in online sales, collections agent, and customer service supervisor. (Tr. 21). The ALJ also alternatively determined Plaintiff could perform other work such as food

and beverage order clerk, document preparer, and charge account clerk. (Tr. 22). Therefore, the

ALJ found Plaintiff not disabled. (Tr. 23).

## STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the

Commissioner's conclusions absent a determination that the Commissioner has failed to apply the

correct legal standards or has made findings of fact unsupported by substantial evidence in the

record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence

is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as

a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health &

Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact

if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*,

474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or

indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn

"so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v.

Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

## STANDARD FOR DISABILITY

Eligibility for benefits is predicated on the existence of a disability. 42 U.S.C. §§ 423(a),

1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by

reason of any medically determinable physical or mental impairment which can be expected to

result in death or which has lasted or can be expected to last for a continuous period of not less

than 12 months." 20 C.F.R. § 404.1505(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The

Commissioner follows a five-step evaluation process—found at 20 C.F.R. § 404.1520—to determine if a claimant is disabled:

1.   Was claimant engaged in a substantial gainful activity?

2.   Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3.   Does the severe impairment meet one of the listed impairments?

4.   What is claimant's residual functional capacity and can claimant perform past relevant work?

5.   Can claimant do any other work considering his residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters*, 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.* The ALJ considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is he determined to be disabled. 20 C.F.R. § 404.1520(b)-(f); *see also Walters*, 127 F.3d at 529.

## DISCUSSION

Plaintiff raises a single, narrow objection to the ALJ's decision. He concedes that "[t]he evidence of record did not support Plaintiff's statements regarding the intensity, persistence, and limiting effects of his cervical spine symptoms *prior to* [his] March 8, 2018 accident" (Doc. 18, at 1), but contends the ALJ did not properly evaluate his neck symptoms after that date in accordance

with Social Security Ruling 16-3p. For the reasons discussed below, the undersigned recommends the Court find no error and affirm.

A claimant's "statements about [his] pain or other symptoms will not alone establish that [he is] disabled." 20 C.F.R. § 404.1529(a); *see also Walters* 127 F.3d at 531 (quoting 20 C.F.R. § 404.1529(a)); *Hash v. Comm'r of Soc. Sec.*, 309 F. App'x 981, 989 (6th Cir. 2009). Instead, a claimant's subjective symptom assertions and resulting limitations are evaluated under the following two-step standard:

> First, we examine whether there is objective medical evidence of an underlying medical condition. If there is, we then examine: (1) whether objective medical evidence confirms the severity of the alleged pain arising from the condition; or (2) whether the objectively established medical condition is of such a severity that it can reasonably be expected to produce the alleged disabling pain.

*Walters*, 127 F.3d at 531 (citing, *inter alia*, 20 C.F.R. § 404.1529(a)). In determining whether a claimant has disabling symptoms, the regulations require an ALJ to consider certain factors including: (1) daily activities; (2) location, duration, frequency, and intensity of pain or symptoms; (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medication; (5) treatment, other than medication, to relieve pain, (6) any measures used to relieve pain, and (7) other factors concerning functional limitations and restrictions due to pain or other symptoms. 20 C.F.R. § 404.1529(c); SSR 16-3p, 2017 WL 5180304, at *7 ("[i]n addition to using all of the evidence to evaluate the intensity, persistence, and limiting effects of an individual's symptoms, we will also use the factors set forth in 20 CFR 404.1529(c)(3)")[2].

---

2. Social Security Regulations previously used the term "credibility" for evaluating a Plaintiff's subjective report of symptoms. *See* SSR 96-7p, 1996 WL 374186. In March 2016, the Social Security Administration issued new Social Security Ruling 16-3p, which eliminated " 'the use of the word 'credibility' . . . to 'clarify that the subjective symptoms evaluation is not an examination of an individual's character.'" *Dooley v. Comm'r of Soc. Sec.*, 656 F. App'x 113, 119 n.1 (6th Cir. 2016) (quoting SSR 16-3p, 2016 WL 1119029, at *1). Both SSR 96-7p and SSR 16-3p direct the ALJ to evaluate an individual's subjective report of symptoms with the factors listed in 20 C.F.R.

Although the ALJ must "consider" the listed factors, there is no requirement to discuss every factor. *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 287 (6th Cir. 2009).

The ALJ's credibility assessment "must be accorded great weight and deference." *Workman v. Comm'r of Soc. Sec.*, 105 F. App'x 794, 801 (6th Cir. 2004) (citing *Walters*, 127 F.3d at 531); *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 536 (6th Cir. 2001) (quoting *Myers v. Richardson*, 471 F.2d 1265, 1267 (6th Cir. 1972) ("[i]t [is] for the [Commissioner] and his examiner, as the fact-finders, to pass upon the credibility of the witnesses and weigh and evaluate their testimony")). It is not for this Court to reevaluate such evidence anew, and so long as the Commissioner's determination is supported by substantial evidence, it must stand. *Workman*, 105 F. App'x at 801. A credibility determination will not be disturbed "absent compelling reason", *Smith v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001), and such findings are "virtually unchallengeable", *Ritchie v. Comm'r of Soc. Sec.*, 540 F. App'x 508, 511 (6th Cir. 2013) (internal quotation omitted). However, the credibility determination "must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 248 (6th Cir. 2007).

The ALJ in this case set forth the two-step process at the beginning of her RFC analysis, explaining:

> In finding that the claimant has the residual functional capacity to perform the range of sedentary work set forth above, I considered all the evidence and evaluated all

---

§ 404.1529. SSR 16-3p. 2016 WL 1119029, at *7; 1996 WL 374186, at *2. Thus, while the term "credibility" was eliminated, prior case law is still applicable. *See Pettigrew v. Berryhill*, 2018 WL 3104229, at *14 n.14 (N.D. Ohio) ("While the court applies the new SSR, it declines to engage in verbal gymnastics to avoid the term credibility where usage of the term is most logical. Furthermore, there is no indication that the voluminous case law discussing and applying the credibility or symptom analysis governed by SSR 96–7p has been invalidated by SSR 16–3p."), *report and recommendation adopted*, 2018 WL 3093696.

> of the claimant's alleged symptoms pursuant to the required two-step process, and I concluded that while the claimant's alleged symptoms are reasonably attributable to his medically determinable impairments, the asserted . . . intensity, persistence, and limiting effects of those symptoms lack record support (20 CFR 404.1527, 404.1529 and SSR 16-3p).

(Tr. 15). The ALJ then summarized Plaintiff's testimony, including (as is relevant here) his statement that "he cannot look down any more than 20 to 30 minutes at a time." *Id.* (internal quotation omitted); *see* Tr. 175 (Plaintiff's testimony that he "tri[ed] not to [look down] more than 20 minutes, a half hour at most" and then would avoid that position for "a couple hours"). Further, in her RFC analysis, the ALJ acknowledged Plaintiff's March 2018 accident, and summarized some of Plaintiff's treatment thereafter:

> Early March 2018 finds the claimant in another automobile accident, with updated imagings [sic] of his cervical spine showing "multilevel degenerative disc disease, disc protrusion, and disc osteophytic complex at C6-T1" (Exhibit 22F). The claimant was again referred to physical therapy, and later that month he saw Jeffrey Cochran, D.O. in orthopedic consultation for complaints of bilateral knee pain (Exhibit 16F). Dr. Cochran's examination of the claimant was remarkable only for a documented BMI of about 56 and "mild crepitus in the patellofemoral joints," consistent with intra-office x-rays that showed "mild degenerative changes within" those bilateral joints (Exhibit 16F). Physical therapy was recommended and the claimant was "advised . . . to stay strong and active, avoiding bed rest" (Exhibit 16F).

> The claimant's knee pain also "improved considerably with physical therapy," with the claimant reporting "no pain" in his knees in June 2018 (Exhibit 21F). Instead, the claimant complained of "probable" carpal tunnel symptoms in his right hand; examination revealed "negative Durkan's, Phalen's, Tinel's" and Spurling's signs, but nerve conduction studies did confirm "mild to moderate right carpal tunnel syndrome" and a release procedure was discussed (Exhibit 24F).

> As of August 2018, according to Dr. Gutlove, the claimant "continue[d] to do very well" on a medication regimen of Tramadol, gabapentin, baclofen, Effexor, and melatonin, which had "improved [the claimant's] overall quality of life and functionality by allowing him to do household chores, interact with family, [and] go[] to restaurants" (Exhibit 25F). The claimant around that time was doing more cooking and other activities in caring for his parents, and he deferred an offer of trigger point injections at that time, noting that "his mother [was] going to be enrolled in hospice," so "the timing [was] not good" (Exhibit 25F).

(Tr. 20). Finally, in her summary conclusion paragraph regarding Plaintiff's physical impairments, the ALJ stated, *inter alia*, that "[n]one of the claimant's medical providers have advised or documented in treatment notes an assessment of the claimant as unable to work or even significantly limited in his capacity for work." (Tr. 21).

Plaintiff faults the ALJ for failing to mention Ms. Canfield's[3] May 2018 examination findings of tenderness with cervical range of motion testing (Tr. 996), and Dr. Gutlove's August 2018 examination findings of decreased range of motion in Plaintiff's cervical spine (Tr. 1074). However, it is "well settled that . . . '[a]n ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party.'" *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) (quoting *Loral Defense Systems– Akron v. N.L.R.B.*, 200 F.3d 436, 453 (6th Cir. 1999)). "Nor must an ALJ make explicit credibility findings as to each bit of conflicting testimony, so long as his factual findings as a whole show that he implicitly resolved such conflicts." *Id.* (quoting *Loral Defense Systems*, 200 F.3d at 453).

Plaintiff contends that these "unmentioned objective findings appear to support [Plaintiff's] testimony that it is difficult for him to look down for an extended period of time." (Doc. 15, at 12). However, the ALJ cited substantial evidence to the contrary. First, the ALJ cited Dr. Gutlove's August 2018 statement that Plaintiff's "medications have improved his overall quality of life and functionality by allowing him to do household chores, interact with family, going to restaurants, and [h]is quality-of-life is clearly improved on these medications." (Tr. 1074); *see* Tr. 20. Indeed, the May 2018 treatment note from Ms. Canfield cited by Plaintiff contains a similar statement. *See* Tr. 996 ("These medications help[] patient perform [activities of daily living], interact with family

---

3. Plaintiff attributes this examination to Dr. Gutlove (*see* Doc. 15, at 11), but this treatment note is signed by Ms. Canfield (*see* Tr. 997) .

and friends."). Improvement with treatment or inconsistency with other evidence of record are valid reasons to discount subjectively-reported symptoms. *See* 20 C.F.R. § 404.1529(c)(4) (instructing ALJ to consider, *inter alia*, "the type, dosage, effectiveness, and side effects of any medication"); *White*, 572 F.3d at 287 (improvement on medication a valid factor in discounting allegations of disabling symptoms); *Walters*, 127 F.3d at 531 ("Discounting credibility to a certain degree is appropriate where an ALJ finds contradictions among the medical reports, claimant's testimony, and other evidence.").

Indeed, the improvement the ALJ cites in Plaintiff's overall abilities and symptoms is also supported by Plaintiff's physical therapy treatment records from June 2018 – after Ms. Canfield's May 2018 examination – where Plaintiff reported he had returned to his prior level of function in his neck, and the physical therapist noted he had met his goals of improved range of motion and lessened right upper extremity numbness. *See* Tr. 976, 978; *see also* Tr. 1015 ("I feel I am overall improved at the neck to my [prior level of function]".).[4] The ALJ could reasonably find the records he cited, and others, demonstrate Plaintiff's improvement and stability inconsistent with Plaintiff's subjective report of greater limitation.

Plaintiff, however, contends the ALJ did not mention Dr. Gutlove's August 2018 statement "in conjunction with an analysis of [Plaintiff's] subjective symptom statements, and did not explain how [Plaintiff's] statements bore on the ALJ's decision or her reasons for discounting those statements". (Doc. 15, at 12). But an ALJ's decision must be read as a whole. *See*

---

4. The ALJ similarly did not cite these physical therapy records in his opinion, but the Court may look to any evidence in the record to determine if the ALJ's rationale is supported by substantial evidence. *See Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001) ("The court may review Dr. Haun's report, in its consideration of the record as a whole, to determine if the ALJ's decision was based upon substantial evidence, even if the ALJ failed to cite the report in its conclusion.").

*Buckhannon ex rel. J.H. v. Astrue*, 368 F. App'x 674, 678-69 (6th Cir. 2010) (noting that courts must "read the ALJ's decision as a whole and with common sense"); *Rice v. Barnhart*, 384 F.3d 363, 370 n.5 (7th Cir. 2004) ("[I]t is proper to read the ALJ's decision as a whole . . ."); *Evans v. Comm'r of Soc. Sec.*, 2020 WL 6064112, at *13 (N.D. Ohio) ("While the ALJ must discuss significant evidence supporting his decision and explain his conclusions with sufficient detail to permit meaningful review, there is no requirement that the ALJ incorporate all the information upon which he relied into a single tidy paragraph."). And substantial evidence "is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw*, 966 F.2d at 1030. It is reasonable to read Dr. Gutlove's statement – quoted by the ALJ – that Plaintiff "continue[d] to do very well" on his consistent medication regimen and that it "improved his overall quality of life and functionality" (Tr. 1074-75); (Tr. 20 ) – as inconsistent with Plaintiff's subjectively-reported limitation of only being able to look down for twenty to thirty minutes. *See, e.g.*, *Cook v. Comm'r of Soc. Sec*., 2012 WL 6839918, at *9 (N.D. Ohio) ("Finally, during the RFC and credibility assessments, the ALJ noted that Cook was doing well on her medication. These observations are sufficient to support the ALJ's assessment of Cook's credibility, particularly given the special deference that this court must give an ALJ's credibility determinations."), *report and recommendation adopted sub nom.*, *Cook v. Astrue*, 2013 WL 139940 (N.D. Ohio).

The undersigned finds this is particularly so in light of the fact that: (1) the ALJ explicitly acknowledged Plaintiff's testimony regarding his neck (and thus did not ignore it) (Tr. 15), (2) the ALJ stated she found his statements overall regarding the intensity and persistence of his symptoms "lack record support" (Tr. 15); and (3) the ALJ later stated that "[n]one of the claimant's medical providers have advised or documented in treatment notes an assessment of the claimant was unable to work or even significantly limited in his capacity for work." (Tr. 21). Indeed, in the

same treatment note Plaintiff cites for Dr. Gutlove's examination findings of decreased range of motion, Dr. Gutlove noted Plaintiff was doing "very well" and advised him to "continue to be as active as possible." (Tr. 1075). Thus, although the ALJ did not explicitly state he was discounting Plaintiff's subjective "looking down" symptom, she was not required to "make explicit credibility findings as to each bit of conflicting testimony" and "[her] factual findings as a whole show that [she] implicitly resolved such conflicts." *Kornecky*, 167 F. App'x at 508 (quoting *Loral Defense Systems*, 200 F.3d at 453).

Plaintiff can certainly point to contrary evidence in the record to support the cited subjectively-reported symptom and the opposite conclusion, such as Ms. Canfield's and Dr. Gutlove's examination findings of some tenderness and reduced range of motion (Tr. 997, 1074), as well as Plaintiff's May 2018 statement to Ms. Canfield that flexion with reading and cooking caused increased pain (Tr. 993). However, the ALJ's analysis finding Plaintiff less limited is supported by substantial evidence as set forth above. *Jones*, 336 F.3d at 477 (even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ").

Given the high level of deference owed to an ALJ's evaluation of a claimant's alleged symptoms and resulting limitations, under the circumstances presented herein, the Court cannot find the ALJ's subjective symptom analysis deficient. As such, the ALJ's decision should be affirmed.

## CONCLUSION AND RECOMMENDATION

Following review of the arguments presented, the record, and the applicable law, the undersigned finds the Commissioner's decision denying DIB supported by substantial evidence and recommends the decision be affirmed.

 s/ James R. Knepp II
United States Magistrate Judge

*ANY OBJECTIONS* to this Report and Recommendation must be filed with the Clerk of Court within fourteen days of service of this notice. Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation. *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985).